STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE

F I L E D SUPERIOR COURT DIVISION

COUNTY OF FORSYTH      2023 AUG 21 A 10:08 FILE NO: 23 CVS 4223

FORSYTH COUNTY, C.S.C.

BY

| | |
|---|---|
| JASMINE MURRAY, on behalf of herself and all others similarly situated; | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| EMS MANAGEMENT & CONSULTANTS, INC.; | ) ) ) |
| Defendant. | |

**COMPLAINT**

*Jury Trial Demanded*

*Class Action*

 

Plaintiff Jasmine Murray ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against EMS Management & Consultants, Inc. ("EMS/MC" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## I.    INTRODUCTION

1.      Plaintiff brings this class action against EMS/MC for its failure to properly secure and safeguard Plaintiff's and other similarly situated individuals' personally identifiable information ("PII") and protected health information ("PHI"), including first and last names, dates of transport, Social Security numbers, dates of birth, financial account information, encounter/

1

transport numbers, billing codes and other patient information (the "Private Information") from criminal hackers.

2.      EMS/MC, incorporated in North Carolina and with a principle office located in Winston-Salem,, Forsyth County, North Carolina, is a billing service provider that exclusively serves emergency medical service providers in the United States. The EMS/MC website lists an address in Lewisville, also in Forsyth County, North Carolina.[1]

3.      EMS/MC serves approximately 240 healthcare clients in 24 states and employs 164 people.[2]

4.      On or about August 9, 2023, EMS/MC sent out data breach notice letters (the "Notice") to individuals whose information was compromised as a result of a hacking incident.

5.      Based on the Notice sent to Plaintiff and over 223,500 others who were also impacted, a vulnerability in EMS/MC's data which was housed on its MOVEit Transfer servers was accessed and exploited by an unknown actor on May 30, 2023 and again in June, 2023, leading to the compromise of Plaintiff's and "Class Members'" (defined below) Private Information (the "Data Breach"). EMS/MC learned the breach impacted their servers on July 12, 2023. In response, Defendant installed all available patches and launched an investigation into the breach.

6.      Plaintiff and Class Members were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm considering the sensitive nature of the Private Information that is now in the hands of cybercriminals. This risk will remain for their respective lifetimes.

---

[1] *See* https://www.linkedin.com/company/ems-management-&-consultants-inc-/; *see also* https:// emsbilling.com (last visited Aug. 18, 2023)
[2] *See* https://www.linkedin.com/company/ems-management-&-consultants-inc-/ (last visited Aug. 18, 2023)

7. The Private Information compromised in the Data Breach included highly sensitive data, representing a gold mine for data and/or identity thieves. The data included, but is not limited to, Social Security numbers, member and plan ID numbers, and PHI that EMS/MC collected and maintained.

8. Armed with the Private Information accessed in the Data Breach (and a head start), data or identity thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

9. There has been no assurance offered by EMS/MC that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices in a manner that would be sufficient to avoid a similar breach of its network in the future.

10. Therefore, Plaintiff and Class Members have suffered, and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

11. Plaintiff brings this class action lawsuit to address EMS/MC's inadequate safeguarding of Class Members' Private Information that it collected and improperly maintained.

3

12.     The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to EMS/MC, especially after the May 30, 2023 breach, and thus EMS/MC was on notice that failing to take necessary steps to secure the Private Information left it and patients like Plaintiff vulnerable to an attack and exposure.

13.     Upon information and belief, EMS/MC and its employees failed to monitor and timely detect the Data Breach that impacted its server or data retention devices. Had EMS/MC properly monitored its networks, it would have discovered the vulnerability sooner and prevented the compromise of Plaintiff's and Class Members' Private Information.

14.     Plaintiff's and Class Members' identities are now at risk because of EMS/MC's negligent conduct as the Private Information that EMS/MC collected and maintained is now in the hands of data thieves and other unauthorized third parties.

15.     Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

16.     Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for Negligence, Negligence Per Se, Breach of Third-Party Beneficiary Contract, Unfair and Deceptive Trade Practices, Unjust Enrichment, Breach of Fiduciary Duty and Declaratory Judgment.

## II.     **PARTIES**

17.     Plaintiff Jasmine Murray is, and at all times mentioned herein was, an individual citizen of the State of Minnesota.

18.     Defendant EMS/MC is a billing service provider headquartered in Forsyth County, North Carolina.

4

### III.    JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from EMS/MC. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20.    This Court has jurisdiction over EMS/MC because EMS/MC operates in and/or is incorporated in this District.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and EMS/MC has harmed Class Members residing in this District.

### IV.    FACTUAL ALLEGATIONS

#### A. *EMS/MC's Business and Collection of Plaintiff's and Class Members' Private Information*

22.    EMS/MC is a North Carolina-based company that touts that it "offers full-service revenue cycle management solutions.  Our services go from software to hardware to billing services and everything in between.  We understand and partner with the EMS industry to provide billing services to meet your needs.  From claim submissions to payment, you'll trust us to get the numbers right and increase your revenue."[3]

23.    EMS/MC further claims that its intelligent claims processing platform:

Brings the best of human judgement and automation together to ensure the highest clean-claim rate and cash-per-trip results in the industry.

---

[3] https://emsbilling.com/about-us/ (last visited Aug. 17, 2023)

5

- Client Care

- Increased Collections

- Compliance.[4]

24.     For over 25 years, and based in Lewisville, North Carolina, EMS/MC now employs over 141 individuals and "currently serves over 260 clients in 24 states, processing over one million claims per year[]" and generates approximately $20 million in annual revenue.[5]

25.     As a condition of providing medical billing services to emergency medical service providers, EMS/MC requires that its clients entrust it with highly sensitive personal and health information belonging to Plaintiff and Class Members, including Private Information.

26.     Due to the highly sensitive and personal nature of the information EMS/MC acquires and stores with respect to its clients' patients' Private Information, EMS/MC, upon information and belief, promises to, among other things: keep the Private Information entrusted to it private; comply with industry standards related to data security and the maintenance of its clients' patients' Private Information; inform its clients' patients of its legal duties relating to data security and comply with all federal and state laws protecting the Private Information entrusted to it; only use and release its clients' patients' Private Information for reasons that relate to the services it provides; and provide adequate notice to clients' patients if their Private Information is disclosed without authorization.

27.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, EMS/MC assumed legal and equitable duties it owed to them and

---

[4] https://emsbilling.com (last visited Aug. 17, 2023)

[5] *See* https://emsbilling.com/about-us/ (last visited Aug. 17, 2023)

knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

28.     Plaintiff and Class Members relied on EMS/MC to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

**B.  *The Data Breach and Defendant's Inadequate Notice to Plaintiff and Class Members***

29.     According to Defendant's Notice, an "incident" within its system's file transfer software application impacted the privacy of Plaintiff's and Class Members' Private Information.

30.     EMS/MC claims that "Information privacy and security are among our highest priorities [and] EMS/MC has strict security measures in place to protect information in its care."[6]

31.     Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including names, dates of transport, Social Security numbers, dates of birth, encounter/ transport numbers, billing codes and "other patient information related to the ambulance transport."[7]

32.     EMS/MC had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

33.     Plaintiff and Class Members provided their Private Information to EMS/MC clients with the reasonable expectation and mutual understanding that EMS/MC would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

---

[6] *See* https://emsbilling.com/notice/ (last visited Aug. 17, 2023)

[7] *Id.*

7

34.     EMS/MC data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

35.     EMS/MC knew or should have known that its electronic records would be targeted by cybercriminals.

### C. The Healthcare Sector is Particularly Susceptible to Data Breaches

36.     EMS/MC was on notice that companies in the healthcare industry are particularly susceptible targets for data breaches.

37.     EMS/MC was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[8]

38.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[9]

---

[8] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited on August 9, 2023).

[9] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at:* https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on August 9, 2023).

39.    The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[10] In 2022, the largest growth in compromises occurred in the healthcare sector.[11]

40.    Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[12]

41.    Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[13]

42.    Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other

---

[10] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last visited on August 9, 2023).

[11] Identity Theft Resource Center, *2022 End-of-Yeare Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited on August 9, 2023).

[12] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited on August 9, 2023).

[13] *Id.*

9

organization, including credit bureaus, have so much monetizable information stored in their data centers."[14]

43.     As a healthcare billing service provider, EMS/MC knew, or should have known, the importance of safeguarding its patients' Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on EMS/MC's patients as a result of a breach. EMS/MC failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### D.  EMS/MC Failed to Comply with HIPAA

44.     Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

45.     EMS/MC's Data Breach resulted from a combination of insufficiencies that indicate Defendant failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from EMS/MC's Data Breach that EMS/MC either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiff's and Class Members' PHI.

46.     Plaintiff's and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

---

[14] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on August 9, 2023).

10

47.     45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

48.     45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

49.     Plaintiff's and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

50.     Plaintiff's and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

51.     Based upon Defendant's Notice to Plaintiff and Class Members, EMS/MC reasonably believes that Plaintiff's and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

52.     Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

53.     EMS/MC reasonably believes that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

54.     Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach,

11

and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

55.     Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

56.     EMS/MC reasonably believes that Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

57.     It is reasonable to infer that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

58.     It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

59.     After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiff and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

60.     In addition, EMS/MC's Data Breach could have been prevented if EMS/MC had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

12

61.    EMS/MC's security failures also include, but are not limited to:

a.  Failing to maintain an adequate data security system to prevent data loss;

b.  Failing to mitigate the risks of a data breach and loss of data;

c.  Failing to ensure the confidentiality and integrity of electronic protected health information EMS/MC creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.  Failing to identify and respond to suspected or known security incidents;

g.  Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i.  Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j.  Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(94); and

13

> *k.* Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

62. Because EMS/MC has failed to comply with HIPAA, while monetary relief may cure some of Plaintiff's and Class Members' injuries, injunctive relief is also necessary to ensure EMS/MC's approach to information security is adequate and appropriate going forward. EMS/MC still maintains the PHI and other highly sensitive PII of its current and former patients, including Plaintiff and Class Members. Without the supervision of the Court through injunctive relief, Plaintiff's and Class Members' Private Information remains at risk of subsequent data breaches.

### E. EMS/MC Failed to Comply with FTC Guidelines

63. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

64. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection

14

system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

65. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

66. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67. As evidenced by the Data Breach, EMS/MC failed to properly implement basic data security practices. EMS/MC's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

68. EMS/MC was at all times fully aware of its obligation to protect the Private Information of its patients yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

15

### F. EMS/MC Failed to Comply with Industry Standards

69.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

70.     Some industry best practices that should be implemented by businesses dealing with sensitive PHI like EMS/MC include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

71.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

72.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

16

73.     Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

## G. EMS/MC Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information

74.     In addition to its obligations under federal and state laws, EMS/MC owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. EMS/MC owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

75.     EMS/MC breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.     Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b.     Failing to adequately protect patients' Private Information;

c.     Failing to properly monitor its own data security systems for existing intrusions;

d.     Failing to sufficiently train its employees regarding the proper handling of its patients Private Information;

e.     Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

17

f. Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

g. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

76. EMS/MC negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

77. Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

78. Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Defendant.

## H. EMS/MC Should Have Known that Cybercriminals Target PII and PHI to Carry Out Fraud and Identity Theft

79. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[15] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the

---

[15] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on August 9, 2023).

ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

80.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

81.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity or data thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

82.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

83.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

84.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[16] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

85.     Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

---

[16] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited August 9, 2023).

86.     In fact, a study by the Identity Theft Resource Center[17] shows the multitude of harms caused by fraudulent use of PII:



87.     PHI is also especially valuable to identity thieves.  As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[18]

88.     Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

---

[17] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited on August 9, 2023).

[18] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on August 9, 2023).

89.     While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[19]

90.     PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

91.     Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[20]

92.     The ramifications of EMS/MC's failure to keep client's Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years, if not a lifetime.

93.     Here, not only was sensitive medical information compromised, but Social Security numbers were compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities

_____

[19] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*:
https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on August 9, 2023).

[20] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-identity-theft/ (last visited on August 9, 2023).

notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

94.     It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[21]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

95.     PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

96.     As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**I.      *Plaintiff's and Class Members' Damages***

*Plaintiff Murray's Experience*

97.     EMS/MC came into possession of Plaintiff Murray's Private Information through provision of its medical billing services to Cloquet Area Fire District, where medical services were provided to Plaintiff Murray.

---

[21] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited August 9, 2023).

98.     When Plaintiff used Cloquet Area Fire District's services, Defendant required that Cloquet Area Fire District provide it with substantial amounts of Plaintiff's PII and PHI.

99.     On or about August 11, 2023, Plaintiff received a letter entitled "Notice of Data Breach" which told her that her PII and PHI had been accessed during the Data Breach. The notice letter informed her that the stolen information included including first and last names, dates of transport, Social Security numbers, dates of birth, financial account information, encounter/ transport numbers, billing codes and other patient information.

100.    The notice letter informed Plaintiff Murray how to activate identity protection, of which consists of only 12 months (one year) of credit monitoring services. One year of credit monitoring is not sufficient given that Plaintiff will now experience years, if not a lifetime, of increased risk of identity theft, including but not limited to, potential medical fraud.

101.    Plaintiff Murray suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

102.    Plaintiff would not have provided her PII and PHI to Cloquet Area Fire District had she been aware of Defendant's inadequate data security practices to safeguard its clients' patients' personal and health information from theft, and that those systems were subject to a data breach.

103.    Plaintiff Murray suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

104.    Plaintiff Murray suffered actual injury in the form of damages to and diminution in the value of her personal and health information – a form of intangible property that Plaintiff Murray entrusted to Defendant for the purpose of receiving healthcare services from Defendant and which was compromised in, and as a result of, the Data Breach.

24

105. Plaintiff Murray suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

106. Plaintiff Murray has a continuing interest in ensuring that her PII and PHI, which remain in the possession of Defendant, are protected and safeguarded from future breaches.

107. As a result of the Data Breach, Plaintiff Murray made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the legitimacy of the Data Breach, reviewing financial and credit accounts for any indications of actual or attempted identity theft or fraud, speaking with Plaintiff Murray's bank to verify all transactions on a go-forward basis, and researching the credit monitoring offered by Defendant. Plaintiff Murray further signed up for the credit monitoring offered by Defendant, at which point she noted a few requests that did not emanate from her. A day or so after activating the offered credit monitoring, Plaintiff Murray was shocked to find out that her activation code was no longer working. Plaintiff Murray is now spending additional time rectifying the credit monitoring deactivation.

108. Plaintiff Murray has spent more than ten hours dealing with the Data Breach thus far, valuable time she otherwise would have spent on other activities.

109. As a result of the Data Breach, Plaintiff Murray has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Murray is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

25

110.    Plaintiff Murray also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her PII and PHI, a form of property that Defendant obtained from Plaintiff Murray; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

111.    As a result of the Data Breach, Plaintiff Murray anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

112.    In sum, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

113.    Plaintiff and Class Members entrusted their Private Information to Defendant in order to receive Defendant's services.

114.    Their Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

115.    As a direct and proximate result of EMS/MC's actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

116.    Further, and as set forth above, as a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing

"freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come, if not a lifetime.

117.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

118.    Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

119.    The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

120.    Additionally, Plaintiff and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[22] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[23]

---

[22] *See* https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/#:~:text=The%20business%20of%20data%20brokering,annual%20revenue%20of%20%24200%20billion. (last visited on August 9, 2023).

[23] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Jan. 16, 2023).

121.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

122.    Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

123.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of EMS/MC, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of its patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

124.    As a direct and proximate result of EMS/MC's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.    CLASS ACTION ALLEGATIONS

125.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

28

126. Specifically, Plaintiff proposes the following Class (referred to herein as the "Class"), subject to amendment as appropriate:

> All individuals in the United States who had Private Information accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

127. Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any judge to whom this case is assigned as well as their judicial staff and immediate family members.

128. Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

129. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

130. <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of over 1.7 million of EM/MC's clients' patients' whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through EMS/MC's records, Class Members' records, publication notice, self-identification, and other means.

131. <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

> a. Whether EMS/MC engaged in the conduct alleged herein;

29

b. Whether EMS/MC's conduct violated the FTCA, HIPAA, and/or North Carolina Unfair and Deceptive Trade Practices Act;

c. When EMS/MC learned of the Data Breach;

d. Whether EMS/MC's response to the Data Breach was adequate;

e. Whether EMS/MC unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f. Whether EMS/MC failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether EMS/MC's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h. Whether EMS/MC's data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether EMS/MC owed a duty to Class Members to safeguard their Private Information;

j. Whether EMS/MC breached its duty to Class Members to safeguard their Private Information;

k. Whether hackers obtained Class Members' Private Information via the Data Breach;

l. Whether EMS/MC had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m. Whether EMS/MC breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

30

n. Whether EMS/MC knew or should have known that its data security systems and monitoring processes were deficient;

o. What damages Plaintiff and Class Members suffered as a result of EMS/MC's misconduct;

p. Whether EMS/MC's conduct was negligent;

q. Whether EMS/MC's conduct was *per se* negligent;

r. Whether EMS/MC was unjustly enriched;

s. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

t. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

u. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

132. <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of EMS/MC. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

31

133.    Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

134.    Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from EMS/MC's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

135.    Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

136.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). EMS/MC has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

32

137.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

138.    Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

139.    EMS/MC knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

140.    EMS/MC's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

141.    EMS/MC knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Defendant was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

142.    EMS/MC owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Defendant's duties included, but were not limited to, the following:

33

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA, the FTCA and the North Carolina Unfair and Deceptive Trade Practices Act;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

143.    EMS/MC's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

144.    EMS/MC's duty also arose because Defendant was bound by industry standards to protect its clients' patients' confidential Private Information.

145.    Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and EMS/MC owed them a duty of care to not subject them to an unreasonable risk of harm.

34

146. EMS/MC, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Defendant's possession.

147. EMS/MC, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

148. EMS/MC, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

149. EMS/MC breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA; and

f. Failing to detect, in a timely manner, the vulnerability that led to the Data Breach of its systems.

150. EMS/MC had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust EMS/MC with their Private Information was predicated

35

on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems (and the Private Information that it stored on them) from attack.

151.    EMS/MC's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

152.    EMS/MC's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

153.    As a result of EMS/MC's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

154.    EMS/MC also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

155.    As a direct and proximate result of EMS/MC's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

156.    The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

157.    Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

158.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring EMS/MC to, *inter alia*, strengthen its data security systems and

monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT II
### NEGLIGENCE *PER SE*
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

159. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

160. Pursuant to Section 5 of the FTCA, EMS/MC had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

161. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., EMS/MC had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

162. Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

163. EMS/MC breached its duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

164. Specifically, EMS/MC breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

37

165.   The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of EMS/MC's duty in this regard.

166.   EMS/MC also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

167.   It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to EMS/MC's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

168.   Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and EMS/MC's failure to comply with both constitutes negligence *per se*.

169.   Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to EMS/MC's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

170.   As a direct and proximate result of EMS/MC's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the actual misuse

38

of their Private Information and/or the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

171. As a direct and proximate result of EMS/MC's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

172. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring EMS/MC to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

173. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

174. Upon information and belief, Defendant entered into virtually identical contracts with its clients to provide health plan administration and other services to them, which services included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to it.

175. Such contracts were made expressly for the benefit of Plaintiff and the Class, as it was their Private Information that Defendant agreed to receive and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

39

176.    Defendant knew that if it were to breach these contracts with its clients, Plaintiff and the Class would be harmed.

177.    Defendant breached its contracts with its clients and, as a result, Plaintiff and Class Members were affected by the Data Breach when Defendant failed to use reasonable data security monitoring measures that could have prevented the Data Breach.

178.    As foreseen, Plaintiff and the Class were harmed by Defendant's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

179.    Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

**COUNT IV**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
*N.C. GEN. STAT. § 75-1.1., ET SEQ*
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

180.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

181.    It is appropriate to apply North Carolina law to the nationwide class claims here because North Carolina's interest in this litigation exceeds that of any other state. Defendant is a North Carolina entity with headquarters in this state and is subject to the laws and regulations of the State of North Carolina, including but not limited to the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75.1.1 ("UDTPA"). That act "declare[s] unlawful" all

40

"[u]nfair methods of competition in or affecting commerce, and unfair of deceptive acts or practices in or affecting commerce." Id. § 75-1.1(a).

182.    For purposes of North Carolina's UDTPA, the term "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." Id. § 75-1.1(b).

183.    Defendant violated the North Carolina UDTPA by engaging in unlawful, unfair, or deceptive business acts and practices in or affecting commerce, as well as unfair, deceptive, untrue, or misleading advertising that constitute acts of "unfair competition" prohibited in the statute.

184.    Upon information and belief, the policies, practices, acts and omissions giving rise to this action emanated from Defendant's headquarters and facilities in North Carolina

185.    Reasonable individuals would be misled by Defendant's misrepresentations and/or omissions concerning the security of their Private Information because they assume companies, like EMS/MC, that collect PII and PHI from patients will properly safeguard such in a manner consistent with industry standards and practices.

186.    EMS/MC failed to inform Plaintiff or Class Members of its inadequate data security practices and procedures that led to the Data Breach, thereby misleading Plaintiff and Class Members. Such misrepresentations and/or omissions were material because Plaintiff and Class Members entrusted EMS/MC with their Private Information.

187.    Had Plaintiff and Class Members known of EMS/MC's failure to maintain adequate security measures to protect their Private Information, they would not have entrusted their Private Information to Defendant.

188.    Plaintiff and Class Members were injured because: a) they would not have paid for services from Defendant had they known the true nature and character of Defendant's data security practices; b) Plaintiff and Class Members would not have entrusted their Private Information to

41

Defendant in the absence of promises that Defendant would keep their information reasonably secure, and c) Plaintiff and Class Members would not have entrusted their Private Information to EMS/MC in the absence of the promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

189. Defendant engaged in unlawful acts and practices with respect to their services by establishing inadequate security practices and procedures described herein; by soliciting and collecting Plaintiff's and Class Members' sensitive information with knowledge that such information would not be adequately protected; and by gathering Plaintiff's and Class Members' sensitive information in an unsecure electronic environment in violation of North Carolina's data breach statute, the Identity Theft Protection Act, N.C. Gen. Stat. § 75-60, et seq., which requires Defendant to undertake reasonable methods of safeguarding the sensitive information of the Plaintiff and other Class Members.

190. In addition, Defendant engaged in unlawful acts and practices when they failed to discover and then disclose the data security breach to Plaintiff and the Class Members in a timely and accurate manner, contrary to the duties imposed by N.C. Gen. Stat. § 75-65.

191. Defendant further violated UDTPA by violating North Carolina's Identity Theft Protection Act (ITPA), N.C. Gen. Stat. § 75-60, *et. seq.* (ITPA) by:

    a. Failing to prevent the PII of Plaintiff and Class Members from falling into unauthorized hands;

    b. Failing to make reasonable efforts to safeguard and protect the PII/PHI, particularly Social Security numbers, of Plaintiff and Class Members;

    c. Failing to provide adequate notice of the security breach to affected patient/consumers upon discovery that their system had been compromised and PII had been disclosed; and

42

d. In other ways to be discovered and proven at trial.

192. As a direct and proximate result of Defendant's unlawful acts and practices, Plaintiff and Class Members have been injured, suffering ascertainable losses and lost money or property, including but not limited to the loss of their legally protected interests in the confidentiality and privacy of their sensitive information.

193. Defendant knew or should have known that their data security practices were inadequate to safeguard Plaintiff and the Class Members' sensitive information, that the risk of a data security breach was significant, and that their systems were, in fact, breached.

194. Defendant's actions in engaging in the above-described unlawful practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Class Members.

195. As a result, on behalf of herself and other members of the Class, Plaintiff seek to enjoin the unlawful acts and practices described herein, and to recover actual damages, and reasonable attorneys' fees.

## COUNT V
## UNJUST ENRICHMENT
## (ON BEHALF OF PLAINTIFF AND THE CLASS)

196. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

197. This Count is pleaded in the alternative to Count III above.

198. Plaintiff and Class Members conferred a benefit on EMS/MC by turning over their valuable Private Information to Defendant in exchange for cybersecurity measures sufficient to protect their Private Information from unauthorized access and disclosure. Plaintiff and Class Members did not receive such protection.

43

199.    Upon information and belief, EMS/MC funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiff's and Class Members' healthcare providers (*i.e.*, Defendant's clients).

200.    As such, a portion of these payments made to Defendant is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to EMS/MC.

201.    EMS/MC has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff's and Class Members' healthcare providers, which payment should have been used for adequate cybersecurity practices that it failed to provide.

202.    EMS/MC knew that Plaintiff and Class Members conferred a benefit upon it, which EMS/MC accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

203.    If Plaintiff and Class Members had known that EMS/MC had not adequately secured their Private Information, they would not have agreed to the provision of such Private Information to Defendant.

204.    Due to EMS/MC's conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendant to be permitted to retain the benefit of its wrongful conduct.

205.    As a direct and proximate result of EMS/MC's conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control

44

how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

206.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from EMS/MC and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by EMS/MC from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

207.    Plaintiff and Class Members may not have an adequate remedy at law against EMS/MC, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

45

208. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

209. In light of the special relationship between EMS/MC and its clients' patients, whereby EMS/MC became a guardian of Plaintiff's and Class Members' Private Information (including highly sensitive, confidential, personal, and other PHI) EMS/MC was a fiduciary, created by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its clients' patients, including Plaintiff and Class Members. This benefit included (1) the safeguarding of Plaintiff's and Class Members' Private Information; (2) timely notifying Plaintiff and Class Members of the Data Breach; and (3) maintaining complete and accurate records of what and where EMS/MC's clients' Private Information was and is stored.

210. Defendant had a fiduciary duty to act for the benefit of Plaintiff and the Class Members upon matters within the scope of their customer/patient relationship, in particular to keep secure the PII of their customers/patients.

211. EMS/MC breached its fiduciary duties to Plaintiff and Class Members by failing to diligently investigate the Data Breach to determine the number of Class Members affected and notify them within a reasonable and practicable period of time.

212. EMS/MC breached its fiduciary duties to Plaintiff and the Class by failing to protect their Private Information.

213. EMS/MC breached its fiduciary duties to Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic PHI EMS/MC created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

214. EMS/MC breached its fiduciary duties to Plaintiff and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain

46

electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR 164.312(a)(1).

215. EMS/MC breached its fiduciary duties to Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

216. EMS/MC breached its fiduciary duties to Plaintiff and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii).

217. EMS/MC breached its fiduciary duties to Plaintiff and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 CFR 164.306(a)(2).

218. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to protect against any reasonably-anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3).

219. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce, in violation of 45 CFR 164.306(a)(94).

220. Defendant breached its fiduciary duties to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

47

221. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to effectively train all members of their workforce (including independent contractors and/or agents) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5).

222. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. § 164.530(c).

223. Defendant breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PII/PHI.

224. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII/PHI is used; (iii) the compromise, publication, and/or theft of their PII/PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII/PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII/PHI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate

48

measures to protect the PII/PHI of customers/patients and former customers/patients in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (ix) the diminished value of Defendant's goods and services they received.

225. As a direct and proximate result of EMS/MC's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer the harms and injuries alleged herein, as well as anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**COUNT VII**
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

226. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

227. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations and state statute[s] described in this Complaint.

228. EMS/MC owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

229. EMS/MC still possesses Private Information regarding Plaintiff and Class Members.

49

230. Plaintiff alleges that EMS/MC's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her Private Information and the risk remains that further compromises of her Private Information will occur in the future.

231. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a. EMS/MC owes a legal duty to secure its clients' patients' Private Information and to timely notify them of a data breach under the common law, HIPAA, and the FTCA;

   b. EMS/MC's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect its clients' patients' Private Information; and

   c. EMS/MC continues to breach this legal duty by failing to employ reasonable measures to secure its clients' patients' Private Information.

232. This Court should also issue corresponding prospective injunctive relief requiring EMS/MC to employ adequate security protocols consistent with legal and industry standards to protect its clients' patients' Private Information, including the following:

   a. Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

   b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

50

     i.        engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering EMS/MC to promptly correct any problems or issues detected by such third-party security auditors;

     ii.      engaging third-party security auditors and internal personnel to run automated security monitoring;

     iii.    auditing, testing, and training its security personnel regarding any new or modified procedures;

     iv.    segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

     v.     conducting regular database scanning and security checks;

     vi.    routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

     vii.   meaningfully educating its clients' and their patients about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

233.    If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at EMS/MC. The risk of another such breach is real, immediate, and substantial. If another breach at EMS/MC occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

51

234. The hardship to Plaintiff if an injunction does not issue exceeds the hardship to EMS/MC if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of EMS/MC's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and EMS/MC has a pre-existing legal obligation to employ such measures.

235. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at EMS/MC, thus preventing future injury to Plaintiff and other patients whose Private Information would be further compromised.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

    a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

    b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

    c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

    d. An order instructing Defendant to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendant to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED: August 18, 2023

Respectfully submitted,

RHINE LAW FIRM, P.C:
Joel R. Rhine
NCSB 16028
Email: jrr@jrr@rhinelawfirm.com
Martin A. Ramey
NCSB: 33617
Email: mjr@rhinelawfirm.com
Ruth A. Sheehan
NCSB 48069
Email: ras@rhinelawfirm.com
Elise H. Wilson
NCSB 60366
Email:ehw@rhinelawfirm.com
1612 Military Cutoff Road Suite 300
Wilmington NC 28403
Telephone (910) 772-9960

Jennifer S. Czeisler (*pro hac vice* to be filed)
**STERLINGTON PLLC**
One World Trade Center
85th Floor
New York, New York 10007
Telephone: (212) 433-2993
jen.czeisler@sterlingtonlaw.com

53

James M. Evangelista (*pro hac vice* to be filed)
**EVANGELISTA WORLEY LLC**
500 Sugar Mill Road
Suite 245A
Atlanta, GA 30350
Tel.: 404-205-8400
Fax: 404-205-8395
Email: jim@ewlawllc.com


Michael A. Tompkins (pro hac vice to be filed)
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite 347
Carle Place, NY 11514
Telephone: 516.873.9550
mtompkins@leedsbrownlaw.com

*Attorneys for Plaintiff*